IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| TIMOTHY KENDRICK and ALICIA WASHINGTON, | ) ) ) |
| Plaintiff, | ) Case No.: 22-cv-1244 ) ) |
| v. | ) ) ) Judge Colin Stirling Bruce |
| THE CITY OF KANKAKEE, KANKAKEE POLICE OFFICER C. CAHOE, | ) ) Magistrate Judge Eric I. Long ) ) |
| Defendants. | ) ) |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME Plaintiffs TIMOTHY KENDRICK and ALICIA WASHINGTON, by and through their attorneys, ED FOX & ASSOCIATES, LTD., and for their response to Defendants THE CITY OF KANKAKEE and KANKAKEE POLICE OFFICER C. CAHOE's motion for summary judgment. Plaintiffs concede and waive Defendants' arguments against Counts II and IV of the amended complaint. Plaintiffs oppose the motion for summary judgment against Counts I and III. Plaintiffs state as follows:

## I.   INTRODUCTION

TIMOTHY KENDRICK (referred to herein as "Kendrick") and ALICIA WASHINGTON (referred to herein as "Washington") (collectively referred to herein as "Plaintiffs") were traveling from Champaign, Illinois to Chicago, Illinois when they were subjected to a traffic stop in Kankakee, Illinois by a CITY OF KANKAKEE (herein referred to as "the City of Kankakee") police officer named C. CAHOE (referred to herein as "Cahoe").

Cahoe's alleged reason for the traffic stop was because the vehicle they were driving (the

"Chevy") violated a law regarding its front registration plate, and its rear registration plate was not illuminated within fifty feet. Cahoe issued Kendrick a traffic ticket for driving the Chevy with its rear registration plate not illuminated. Immediately after the stop, Plaintiffs exited the vehicle, walked to its rear, and confirmed that, contrary to Cahoe's assertions, the rear registration plate was illuminated. Washington took videos and photos of proof that the rear registration plate was illuminated. Thereafter, Kendrick filed a complaint with the City of Kankakee, alleging that the stop was unlawful. A City Investigator investigated the matter and found against Cahoe and recommended he be suspended. Also, Kendrick's traffic ticket was dismissed.

Plaintiffs claim and have the evidence to prove that they were wrongfully detained in violation of the Fourth Amendment and falsely arrested/imprisoned in violation of state law. Defendants filed a motion for summary judgment. However, the Court should deny their motion as to Counts I and III of the amended complaint because there is a genuine issue of material fact as to whether Cahoe had a reasonable suspicion to believe Kendrick violated a traffic law and whether he knew he was violating the law when he conducted the stop, precluding qualified immunity.

## II. RESPONSE TO UNDISPUTED MATERIAL FACTS

### a. Undisputed material facts

Plaintiffs concede facts numbered: 1, 2, 4, 5, 13, 15, 17, 18, 19, 20, 22, 34, 42.

### b. Disputed material facts

3. Just prior to the incident with Plaintiffs, Cahoe was stationed in his police vehicle, facing north, at Jaenicke's Root Beer Stand's parking lot on the 300 E. River Street block in Kankakee, IL, where he was observing traffic. (Pl. Ex. A, Photo of Jaenicke's parking lot; Kendrick Dep., pp. 30-32; Washington Dep., pp. 25-26, 28, 75-77, 99; Cahoe Dep., pp. 13-14).

9. The area was well lit. (Kendrick Dep., p. 33, 80-81, 224; Def. Ex. F, Cahoe Dashcam Video).

11. The Chevy had a securely positioned front registration plate. (Kendrick Dep., pp. 221-222; Washington Dep., p. 104).

12. The rear registration plate of the Chevy was illuminated. (Pl. Ex. B-J, Photos and Videos taken by Washington).

14. The rear registration plate of the Chevy was illuminated. (Pl. Ex. B-J, Photos and Videos taken by Washington).

16. As Plaintiffs drove past Cahoe, and before Cahoe conducted the traffic stop, Cahoe looked at Kendrick. The two made eye contact. (Kendrick Dep., pp. 30-37, 80-81, 225).

23. The rear registration plate of the Chevy was illuminated by the rear registration plate lightbulb. (Pl. Ex. B-J, Photos and Videos taken by Washington).

24. Whether Kendrick was aggressive, confrontational and was at times yelling at Officer Cahoe is not relevant to whether the stop and issuance of the citation was lawful. Kendrick was scared because he was stopped for no cause. Additionally, Cahoe's microphone was not working, so there is no voice recording of their communications. (Pl. Ex. K, Investigation Documents; Pl. Ex. L, Letter; Kendrick Dep., p. 66-67).

27. The rear registration plate of the Chevy was illuminated. (Pl. Ex. B-J, Photos and Videos taken by Washington).

28. Cahoe handed the citation to Kendrick at approximately 1:48:23 a.m. (Def. Ex. F, Cahoe Dashcam Video).

31. Immediately after Cahoe and Coash returned to their respective police vehicles, Kendrick and Washington exited the Chevy and walked to its rear. (Kendrick Dep., pp. 106-107, 111-112, 114, 235; Washington Dep., pp. 30-34, 92-93, 118, 132-133).

33. The first video Washington took of the rear registration plate was at 1:50 a.m. (Pl. Ex. B; Timestamp of First Video).

40. Kendrick testified that the rear registration plate was illuminated. (Kendrick Dep. pp. 219-220).

43. During the stop on December 17, 2021, Ingalls did not inspect the Chevy's rear license plate area to determine whether the lightbulb was working. Also, the Chevy's rear registration plate does not appear to be less illuminated than the rear registration plate of other vehicles. (Ingalls Dep., pp. 73-74). (Pl. Ex. J; Ingalls Dash Camera Video).

44. During the stop on December 17, 2021, Ingalls did not inspect the Chevy's rear license plate area to determine whether the lightbulb was working. (Ingalls Dep., pp. 73-74).

  **c. Disputed immaterial facts**

35. The traffic ticket Cahoe issued Kendrick was dismissed by the prosecutors after Cahoe failed to appear at any of the court dates. (Kendrick Dep., 256-257, 264; Washington Dep., p. 143).

  **d. Undisputed immaterial facts**

6. It does not matter who owned the vehicle. The rear registration plate was illuminated at the time of the stop.

7. It does not matter how Steven Washington maintained the vehicle. The rear registration plate was illuminated at the time of the stop.

8. It does not matter whether Plaintiffs know whether Steven Washington changed the lightbulb. The rear registration plate was illuminated at the time of the stop.

10. Cahoe also saw that the Chevy's rear registration plate was illuminated.

21. Plaintiffs were not asked to exit the vehicle during the stop. They exited the vehicle immediately after the stop, while Cahoe was still at the scene.

25. This fact had nothing to do with whether the vehicle's rear registration plate was illuminated. Washington was not driving the vehicle, there was no reason for her to provide her identification to Cahoe.

26. This fact had nothing to do with whether the vehicle's rear registration plate was illuminated. Washington was not driving the vehicle, there was no reason for her to provide her identification to Cahoe.

29. Plaintiffs did not allege that they were arrested, handcuffed, or taken into custody.

30. Plaintiffs did not allege that the Chevy was searched or that Cahoe asked to search it.

32. The dashcam video also shows other vehicles that drive past, and their rear registration plates do not appear to be illuminated.

36. The case was dismissed.

37. Regardless, Kendrick was charged with violating the law.

38. Regardless, Kendrick was charged with violating the law.

39. Regardless, Kendrick was charged with violating the law. Also, Kendrick should not have to pay any fines for violations he did not commit.

41. Trooper Ingalls unreasonably prolonged the stop, but that has nothing to do with whether the Chevy's rear registration plate was illuminated.

   e. **Additional material facts**

1. Kendrick and Washington are African American. (Washington Dep., pp. 10, 139-140; Kendrick Dep., 12, 36, 39, 90-91, 223-224).

2. Cahoe is Caucasian. (Kendrick Dep., pp. 35-37, 80-81; Washington Dep., pp. 127, 145-146).

3. Cahoe knew Plaintiffs were African American before he conducted the traffic stop because he looked right at Kendrick as they drove past. (Kendrick Dep., pp. 30-37, 80-81, 225).

4. Cahoe was to the right of Plaintiffs when they drove past him. (Kendrick Dep. p. 30).

5. Kendrick and Washington were traveling from Champaign, Illinois to Chicago, Illinois, when they got pulled over by Cahoe. (Kendrick Dep., pp. 27-28, 78, 205, 207, 209, 241; Washington Dep., pp. 24, 27, 29, 32, 91-92, 131-133, 135).

6. Kendrick and Washington checked and confirmed that the rear registration plate light was working and that the rear registration plate was illuminated before they left Champaign. (Kendrick Dep., pp. 39-40, 76-78, 101, 209, 215, 251-252; Washington Dep., pp. 31-32, 50-52, 76-77, 92-94, 103-104, 114-115, 106-108, 125, 132).

7. In response to Plaintiffs' Interrogatory No. 2, Cahoe stated that there was no front registration plate on the Chevy. In his deposition, he contradicted his response to the interrogatory by stating that the Chevy had a front registration plate, but it was improperly secured, hanging down by a single screw. (Pl. Ex. M, Cahoe's Response to Plaintiffs' Interrogatory No. 2; Cahoe Dep., pp. 12, 15, 36-37).

8. The Chevy did not have tinted windows. (Kendrick Dep., p. 211; Washington Dep., p. 95).

9. Kendrick was traveling under the speed limit as he passed Cahoe. (Kendrick Dep., pp. 31-32, 67, 74, 79, 254; Washington Dep., pp. 98-100, 141, 172).

10. The Chevy had a front registration plate that was properly secured and not hanging down by a single screw. (Kendrick Dep., p. 221, 254; Cahoe Dep., p. 37).

11. Shortly after the stop on March 22, 2022, Kendrick stopped at a gas station, walked around the Chevy, and remembers that the front registration plate was secure and not hanging down by a single screw. (Pl. Ex. O. Kendrick Affidavit)

12. Prior to initiating the stop on Plaintiffs, Cahoe ran a registration plate check on the Chevy. (Pl. Ex. K, Cahoe's Response to Plaintiffs' Interrogatory No. 6; Cahoe Dep. pp., 32-34, 37, 43-44).

13. Cahoe and Coash left the scene shortly after Kendrick and Washington exited the Chevy. But Coash left first. (Kendrick Dep., pp. 106-107; Washington Dep., p. 30; Cahoe Dep., p. 16; Pl. Ex. N, Coash Deposition, pp. 37, 51).

14. Cahoe remained behind the Chevy while Kendrick and Washington got out and walked to the vehicle's rear. Washington started recording the registration plate on her phone. The audio of Cahoe's police car leaving can be heard in the video. (Washington Dep., p. 30; Cahoe Dep., p. 16).

15. Other vehicles that drove past during the stop had various levels of illumination on their rear registration plate. Some appeared brighter than others. (Def. Ex. F, Cahoe Dashcam Video; Coash Dep., pp. 25-30).

16. Immediately after the stop, Washington captured videos and photos of the Chevy's rear registration plate area, which show that the rear registration plate was illuminated. (Pl. Ex. B-J, Photos and Videos taken by Washington; Kendrick Dep., pp. 111-114, 127-132, 137-140, 179-201, 235-237, 251-254; Washington Dep., pp. 31-33, 37, 39-40, 49, 52, 54, 69-86, 96-98, 105-107, 148-153).

17. Plaintiffs did not maneuver or touch the light before Washington took the photos and videos. (Kendrick Dep., pp. 220-221, 237; Washington Dep., pp. 144-145).

18. Coash does not recall observing the Chevy's rear registration plate not being illuminated when she was assisting Cahoe with the traffic stop. (Coash Dep., pp. 21, 31-23).

19. In her deposition, Coash viewed photos and videos that Washington took immediately following the March 22, 2022 stop and stated that the registration plate appeared illuminated. (Pl. Ex. B-J, Photos and Videos taken by Washington; Coash Dep., pp. 38-55).

20. In her deposition, Coash, upon viewing the dash camera footage from Cahoe's police vehicle, was asked about the illumination of license plates on vehicles driving past. She stated that many appeared not to be illuminated. (Def. Ex. F, Cahoe Dashcam Video; Coash Dep., pp. 25-30).

21. On or about March 22, 2022, Kendrick filed a Preliminary Citizen Complaint with the Kankakee Police Department alleging that the stop and the issuance of the citation were unlawful. (Pl. Ex. L, Preliminary Citizen Complaint; Kendrick Dep., pp. 14-15).

22. On or about April 6, 2022, Inspector Ronald L. Bartlett of the Kankakee City Police Department sent Kendrick a letter stating that after a review of the information which Kendrick provided and other evidence, which was submitted, they ruled that the basis of his complaint was founded. (Pl. Ex. M, Investigation Documents; Pl. Ex. N, Letter; Cahoe Dep., pp. 22, 39; Kendrick Dep., pp. 133-134; Washington Dep., 14, 42-43).

23. Inspector Ronald L. Bartlett recommended that Cahoe be disciplined. (Pl. Ex. N, Letter).

24. If a vehicle is stopped in the same county where a previous stop occurred, the squad cars' computer system usually displays the reason for the earlier stop upon conducting a registration plate check. (Cahoe Dep., p. 34; Coash Dep., pp. 58-59).

25. At times, Ingalls leans underneath the rear of a vehicle if he is unsure whether a vehicle's rear registration plate lightbulb is functioning but did not do so on December 17, 2021. He did not do that when he stopped the Chevy. (Ingalls Dep., p. 74).

26. During his deposition, Ingalls stated that the Chevy's registration plate seemed to be illuminated upon viewing the photos taken by Washington immediately following the stop on March 22, 2022. (Ingalls Dep., pp. 76-77).

27. On December 17, 2021, Ingalls was experiencing ongoing vision problems, but he was not wearing his glasses and was uncertain whether he had his contacts in. He admitted that there are times when he works without wearing either glasses or contacts despite his eyesight issues. (Ingalls Dep., pp. 71-72).

28. Ingalls admitted that without his glasses or contacts, he struggles to read letters and numbers clearly, a difficulty that was also true on December 17, 2021. (Ingalls Dep., p. 23).

29. Kendrick and Washington observed that the rear registration plate was illuminated on the Chevy on prior occasions while traveling behind the vehicle. The most recent time was a few days before the March 22, 2022 incident. (Kendrick Dep., pp. 212-214; Washington Dep., p. 95).

30. At no point during the stop did Cahoe inform Plaintiffs that the Chevy was in violation regarding the front registration plate. (Cahoe Dep. pp. 36-37).

31. Cahoe typically waits for vehicle he stopped to depart from the scene before he leaves. (Cahoe Dep. p. 16).

32. After Ingalls stopped Plaintiffs over, Kendrick checked to see whether the rear registration plate was illuminated and confirmed that it was. (Kendrick Dep. pp. 219-220).

33. The area where Plaintiffs drove past Cahoe was well lit. (Kendrick Dep., p. 33, 80-81, 224; Def. Ex. F, Cahoe Dashcam Video).

34. Ingalls stated that the reason he stopped Plaintiff was because he believed the Chevy's rear registration plate was not illuminated. (Ingalls Dep. pp. 45-46).

35. On December 17, 2021, Ingalls stopped Plaintiff in Kankakee County. (Ignalls Dep. pp. 8-11, 70).

36. Just prior to the incident with Plaintiffs, Cahoe was stationed in his police vehicle, facing north, at Jaenicke's Root Beer Stand's parking lot on the 300 E. River Street block in Kankakee, IL, where he was observing traffic. (Pl. Ex. A, Photo of Jaenicke's parking lot; Kendrick Dep., pp. 30-32; Washington Dep., pp. 25-26, 28, 75-77, 99; Cahoe Dep., pp. 13-14).

### III.    LEGAL STANDARD

On a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is inappropriate when there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. *Id*. The evidence in the record must be viewed in the light most favorable to the nonmoving party. *Id*.

### IV.    ARGUMENT

**A.    The motion for summary judgment should be denied because there is a genuine issue of material fact as to whether Cahoe reasonably suspected that the Chevy was in violation of any traffic laws.**

"An officer's temporary detention of an individual during a traffic stop constitutes a seizure of a person ... and thus must be reasonable under the circumstances." *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir.2014). A traffic stop is reasonable when an officer has a "reasonable articulable suspicion that criminal activity is afoot," including an "observed violation of traffic law." *United States v. Riley*, 493 F.3d 803, 808 (7th Cir.2007); *Huff*, 744 F.3d at 1004. "Reasonable suspicion amounts to something less than probable cause but more than a hunch." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir.2005). Assessment of whether reasonable suspicion exists is an objective inquiry requiring consideration of "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Riley*, 493 F.3d at 808.

In this case, Plaintiffs have sufficient evidence for a reasonable jury to conclude that Cahoe did not have a reasonable suspicion that Plaintiffs violated any traffic laws, thus there was no just cause to stop them. Cahoe claims that he witnessed the Chevy violate multiple traffic laws, a violation regarding its front registration plate and another violation regarding its rear registration plate. (DMF 5). However, there is a discrepancy in his testimonies.

### i. There was no reasonable suspicion to believe that the Chevy was violating any traffic laws regarding the front registration plate.

In his answer to Plaintiffs' Interrogatory No. 2, Cahoe stated that the Chevy had no front registration plate. (Pl. Ex. M; AMF 7). In his deposition, he contradicted his answer to the interrogatory by stating that the Chevy had a front registration plate that was improperly secured, hanging down by a single screw. (Id.) While either violation, if true, would justify a stop, Plaintiffs dispute both versions of his story.

Plaintiffs testified that they inspected the Chevy's front registration plate before the stop, and the front registration plate was there and adequately secured. (AMF 6). Shortly after the traffic stop, Kendrick pulled over at a gas station, walked around the Chevy, and recalls that the front plate was there and was properly secured. (AMF 11). Also, during the traffic stop, Cahoe did not mention to Plaintiffs that he observed any issues with the front license plate, nor did he issue Plaintiff Kendrick a citation for any violation regarding the front registration plate. (AMF 30). Because the evidence in the record must be viewed in the light most favorable to the nonmoving party, the Court should assume that there were no issues with the front registration plate.

### ii. There was no reasonable suspicion to believe that the Chevy's rear registration plate was not illuminated.

Cahoe also asserted that the Chevy's rear registration plate was not illuminated within fifty feet. (DMF 10, 11, 12, 14). Plaintiffs have abundant evidence for a jury to conclude that there was

9

no reasonable suspicion to believe that the rear license plate was not illuminated within fifty feet.

First and foremost, immediately after the stop, Plaintiffs exited the vehicle, and Washington took three videos and two photos on her cellphone that clearly show that the rear registration plate was illuminated. (AMF 16; Pl. Ex. B-I). The first video Washington took was at 1:50 a.m. (Pl. Ex. B). Cahoe's police vehicle's dash camera ends at 1:49:25 a.m. (Def. Ex. F). Plaintiffs agree with Defendants that the Chevy's rear registration plate was at least supplementary illuminated by the light emanating from the police vehicle's lights while it was behind the Chevy.

In other words, it is impossible to tell whether the Chevy's rear registration plate was illuminated, notwithstanding the lights emanating from Cahoe's police vehicle from the dash camera video. In the three videos Washington took, it can be seen what the rear registration plate looks like with her cellphone's flash on and what it looks like when there are no lights not attached to the Chevy aiding in illuminating the rear registration plate. (Pl. Ex. G-I). It is clear from the videos and photos Washington took that the rear registration plate was illuminated. (Id.)

Also, assuming that the clocks on Cahoe's dash camera and Washington's cellphones were aligned, the most time that could have passed from when Cahoe's dash camera ended, and the time Washington took the first video was one minute and thirty-five seconds. Pl Ex. B, G-I; Def. Ex. F). Plaintiffs testified that they did not manipulate the lightbulb before Washington took the videos and photos. (AMF 17). Washington also testified that Cahoe was still at the scene when she took a video of the rear registration plate. (AMF 14). The video's audio captured a vehicle driving. (Pl. Ex. I). Washington believes that the sound came from Cahoe's police vehicle. (Id.) Cahoe testified that he typically waits for the vehicle he stops to depart first before leaving. (AMF 31). Officer Coash testified that she left the scene before Cahoe. (AMF 13).

Based on this evidence, the Court should assume that Plaintiffs did not manipulate the

10

lightbulb before Washington took the videos and photos of the rear registration plate. Otherwise, Cahoe would have saw them do it. The Court should also assume that Cahoe did not wait at the scene until Plaintiffs left because he knew that he stopped them unlawfully and wanted to get out of there as quickly as possible.

In an attempt to prove that there is no issue of material fact as to whether the Chevy's registration plate was illuminated, Defendants provided two poor resolution and incredibly blurry screenshots taken from Cahoe's dash camera within the exact second while the police vehicle was turning. (Def. Ex. D). Defendants also provided an additional screenshot taken from the same video approximately ten minutes later from a different position. (Def. Ex. G). In the third screenshot, they pointed to another vehicle as an example of what a vehicle with an illuminated rear registration plate is supposed to look like in the dash camera video. (Id.) Defendants attempted to use the screenshots to prove that the Chevy's rear registration plate was not illuminated at the stop. However, there are multiple problems with these attempts.

In the first two screenshots, the police vehicle was moving and turning onto the street the Chevy was on, the Chevy was moving, the snapshots were blurry and low resolution, and the camera's positioning was different than in the following screenshot. (Def. Ex. D). Also, at the time of the third screenshot, Cahoe's police vehicle's lights were aiding in illuminating the vehicle's rear registration plate, and it cannot be determined based on the dash camera video how much of the illumination was caused by the lights from the police vehicle. (Def. Ex. G). This is similar to why it cannot be determined how much of the Chevy's rear registration plate illumination came from the police vehicle's lights versus its registration plate light from the dash camera video.

Also, approximately twenty vehicles passed from when Cahoe stopped the Chevy until the dash camera video ended. (Def. Ex. F). Defendants chose to take a screenshot at the time the

11

vehicle that appeared to be the most illuminated passed to show the Court. However, out of the twenty vehicles or so that passed the Chevy during the entirety of the dash camera video, the rear registration plates on the various vehicles appeared to have various levels of illumination. (Id.)

While it cannot be determined from these screenshots that the Chevy's rear registration plate was independently illuminated, it also cannot be determined that it was not for that very same reason. It would likely require an expert witness to testify regarding the reliability of those screenshots, which Defendants have not done. For those reasons, the three screenshots of the dash camera video taken independently or in comparison to each other do not prove that the Chevy's rear registration plate was not illuminated.

Furthermore, Defendants argue that because the Chevy was pulled over approximately three months before this incident by Illinois State Police Officer Ingalls for the same reason, it must mean that the registration plate was not illuminated. However, a genuine issue of material fact exists regarding the facts of the incident with Ingalls.

First, Plaintiffs have evidence for a jury to determine that Ingalls is not a credible witness. When he stopped the Chevy, he had vision issues, was not wearing glasses, and was probably not wearing contacts. (AMF 27). He also admitted that he struggles to read letters and numbers when he fails to wear his glasses or contacts. (AMF 28). It could have been due to his poor vision if he genuinely did not believe the Chevy's registration plate was not illuminated enough to read the letters and numbers.

Additionally, just as it is impossible to determine whether the Chevy's rear registration plate is illuminated by its own lights from Cahoe's police vehicle's dash camera video, it is likewise impossible to determine from Ingalls', contrary to Defendants' arguments. (Pl. Ex. J). Also, Ingalls testified that he never confirmed whether the rear registration plate light on the Chevy

was even working. (AMF 25). He testified that he would typically lean down and make sure but did not do so this time. (Id.) This creates doubt as to whether the Chevy's rear registration plate light worked during the Ingalls incident. (AMF 32). There is a genuine issue of material fact as to whether the Chevy's rear registration plate was illuminated at this time.

  Cahoe claims that he stopped Plaintiffs because the rear registration plate of the Chevy was not illuminated from within fifty feet. (DMF 10, 11, 12, 14, 40). However, that is unlikely. Cahoe likely stopped Plaintiffs because he saw they were African American. (AMF 1-3). Kendrick testified that he and Cahoe made eye contact while driving past Cahoe. (AMF 3). Kendrick was driving the vehicle slowly, the Chevy did not have tints, the area where Kendrick passed Cahoe was well-lit, and Washington was between Kendrick and Cahoe. (AMF 4, 8, 9, 33). Cahoe was parked at Jaenicke's Root Beer Stand's parking lot. (AMF 36). There was no good reason why he would not see them and not know that they are African American. Because these facts must be viewed in the light most favorable to Plaintiffs, the Court should assume that Cahoe saw them, knew they were African American, and then stopped them because of it.

  Furthermore, Cahoe testified that he ran the Chevy's registration plate before exiting his police vehicle and approaching it. (AMF 12). He also testified, and Officer Coash confirmed that when a stop occurs within the same county, the police computer system in their police vehicles displays prior stops and the reason for the stop. (AMF 24). Ingalls stopped the Chevy approximately three months earlier in Kankakee County and gave Kendrick a written warning for driving the Chevy without an illuminated rear registration plate. Cahoe could have seen that the Chevy was pulled over for this in the past after he ran the plate. He could have believed that this would be an excellent excuse to stop the vehicle even though he knew that the rear registration plate was indeed illuminated. Viewing this evidence in the light most favorable to Plaintiffs, the

13

Court should assume that Cahoe knew about the reason for the prior stop before he stopped the Chevy and used it as a pretext in an attempt to justify the stop.

Also, in her deposition, Coash testified that she did not notice that the rear registration plate was not illuminated while assisting Cahoe with the traffic stop. (Pl. Ex. N; AMF 19). Also, when looking at other vehicles that drove past the stop, Coash stated that many of their rear registration plates appeared not to be illuminated. (AMF 20). Viewing the evidence in the light most favorable to Plaintiffs, the Court should assume that she did not see Chevy's registration plate not being illuminated because it was in fact illuminated and that some vehicles' rear registration plates footage do not appear to be illuminated in the dash camera video even though they are. (Def. Ex. F).

Finally, it is worth noting that after the traffic stop, Kendrick filed a complaint with the City of Kankakee alleging that the stop was unlawful. (AMF 21). Inspector Bartlett investigated the case, and concluded that Cahoe stopped the Chevy without cause, and recommended he be reprimanded. (Plaintiff Ex. K, L; AMF 22, 23). Viewing this in the light most favorable to Plaintiffs, the Court should assume that Bartlett, the person working for the City of Kankakee, would not find against another person working for the same employer unless they believed his actions were wrong.

For the reasons mentioned above, the Court should conclude that there is a genuine issue of material fact as to whether Cahoe reasonably suspected that Chevy violated any traffic laws and should deny Defendants' motion for summary judgment.

**B.    Cahoe is not entitled to qualified immunity because there is a genuine issue of material fact as to whether he knowingly violated the law.**

Qualified immunity is an affirmative defense that protects government officials from liability for civil damages. *Gibbs v. Lomas*, 755 F.3d 529, 2014 WL 2736066, at *5 (7th Cir. Jun.

14

17, 2014). To determine whether a government officer is entitled to qualified immunity, a court asks "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir.2013). It was clearly established law that a police officer cannot stop a vehicle without probable cause or a reasonable suspicion of a violation of law. *United States v. Chang*, 999 F.3d 1059, 1065 (7th Cir. 2021).

Qualified immunity does not apply to those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986) "Arguable probable cause" may apply when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law. *Fleming v. Livingston Cnty.*, Ill., 674 F.3d 874 (7th Cir. 2012).

This is not a case where Cahoe should be saved by arguing that "arguable probable cause" exists and he is entitled to qualified immunity At this point, there is a genuine issue of material fact as to why he stopped the Chevy for the very same reasons explained in the previous section. Perhaps Cahoe truly believed that the rear registration plate was not illuminated. Or the real reason is more heinous, such as because he saw that Plaintiffs were African American. At this time, viewing all of the evidence in the light most favorable to Plaintiffs, the Court must assume Cahoe's reason was heinous.

For the reasons mentioned above, there is more than enough evidence on the record for a jury to conclude that Cahoe knowingly violated the law. Therefore, qualified immunity does not apply, and Defendants' motion for summary judgment should be denied.

## V. CONCLUSION

Defendants' motion for summary judgment should be denied in part. Plaintiffs concede that the Court should grant summary judgment or dismiss Counts II and IV from the amended complaint. However, the Court should deny Counts I and III. The Court should deny those counts because there is a genuine issue of material fact as to whether Cahoe reasonably suspected the Chevy's rear registration plate was not illuminated and whether he knew he was violating the law, precluding him from receiving qualified immunity.

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| TIMOTHY KENDRICK and ALICIA WASHINGTON, )<br>)<br>) | |
| Plaintiff, ) | Case No.: 22-cv-1244 |
| ) ) | |
| v. ) ) | |
| THE CITY OF KANKAKEE, ) KANKAKEE POLICE OFFICER C. ) CAHOE, ) ) | |
| Defendants. ) | |

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that on December 15, 2023, I electronically filed the foregoing *Plaintiffs' Response to Defendants' Motion for Summary Judgment* with the Clerk of the U.S. District Court for the Central District of Illinois, Urbana Division, using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

TO:
Michael W. Condon
Jason W. Rose
Hervas, Condon & Bersani. PC
333 Pierce Rd., Suite 195 Itasca, IL 60143
mcondon@hcbattorneys.com
jrose@hcbattorneys.com
(630) 773-4774
*Attorneys for Defendants*

                                                 */s/Peter T. Sadelski*
                                                 Peter T. Sadelski
                                                 ED FOX & ASSOCIATES, LTD.
                                                 118 North Clinton Street, Suite 425
                                                 Chicago, Illinois 60661
                                                 (312) 345-8877
                                                 psadelski@efoxlaw.com
                                                 *Attorney for Plaintiffs*